UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| 4100 WEST GRAND LLC, | ) | Case No. 11-42873 |
| | ) | |
| Debtor, | ) | Hon. Jacqueline P. Cox |
| _____ | ) | |
| 4100 WEST GRAND LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 11-02278 |
| | ) | |
| v. | ) | |
| | ) | |
| TY GRAND LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON ADVERSARY PROCEEDING**

This matter comes before the Court on the adversary complaint (the "Complaint") of 4100 West Grand, LLC, debtor in possession ("Plaintiff" or the "Debtor") against TY Grand LLC[1] ("TY Grand" or "Defendant") to avoid and recover a transfer alleged to be fraudulent pursuant to 11 U.S.C. §§ 544, 548 and 740 ILL. COMP. STAT. §§ 160/5 and 160/6. For the reasons noted herein, the Court enters judgment for the Defendant.

I.    JURISDICTION

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C.

_____

[1]Matthew Brotschul was also named as a defendant in the Complaint, but the claims asserted against him were dismissed.

§1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(H) which designates as core "proceedings to determine, avoid, or recover fraudulent conveyances."

## II.   FACTS AND BACKGROUND

The Plaintiff, 4100 West Grand, LLC exercised its authority pursuant to 11 U.S.C. § 1107(a) as a debtor-in-possession to avoid as a fraudulent transfer the September 30, 2011 recording of a deed in lieu of foreclosure.

### A.     The Parties

TY Grand LLC, the Defendant herein, is an Illinois limited liability company, engaged in the business of making loans on real estate. The Defendant acquired the note secured by real estate that was owned by the Debtor. Defendant conducts its business in Chicago, Illinois.

Matthew Brotschul ("Brotschul") is an attorney licensed to practice law in Illinois; he is an authorized representative of Defendant, TY Grand LLC. Brotschul was involved in the formation of the Debtor. *See* July 10 - 11, 2012 Trial Transcript on Adversary Proceeding 11-02278, at 69 ("Trial Tr.").

Ruben Ybarra is a real estate investor, and Manager of Defendant TY Grand LLC. (Trial Tr. at 184 ; Plaintiff's Exhibit 16, Affidavit of Ruben Ybarra).

Bruce Teitelbaum, and Yolanda Ybarra, through an LLC are the owners of TY Grand. (Trial Tr. at 68-69, 182-183).

-2-

Ljubomir Sopcic is a member of 4100 West Grand, LLC. (Trial Tr. at 293).

### B.    The RBS Charter One Loan

On September 20, 2007, Charter One Bank made a loan to the Plaintiff in the amount of $2,100,000 (the "Loan"). The Loan was secured by commercial real estate located at 4100 West Grand Avenue, Chicago, Illinois (the "Property"). The Loan was evidenced and secured by the following instruments: a Loan Agreement; a Five-Year Adjustable Term Note ("Note"); Unlimited Guaranties executed separately by Dennis Sopcic, Ljubomir Sopcic, and Joseph Murphy; a Commercial Mortgage; a Security Agreement and an Assignment of Leases and Rents (collectively, the "Loan Documents"). (Joint Stipulation, ¶ 8, dkt. no. 73).

On or before December 31, 2010, the Plaintiff defaulted on the Loan Documents (the last payment was made in September, 2009). (Joint Stipulation, ¶ 9, dkt. no. 73. *See also* Trial Tr. at 206, 249). On March 29, 2011, Royal Bank of Scotland, successor in interest to Charter One Bank, assigned the Loan Documents to the Defendant. The Loan Documents were purchased by the Defendant for $515,000. The Plaintiff contributed $110,000 of the sale price. (Trial Tr. at 76). The remaining $405,000 was paid by TY Grand, LLC. The Debtor was then liable on the $2.5 million debt to TY Grand LLC.

### C. The Forbearance Agreement

Prior to March 29, 2011, the Plaintiff and one or more of the principals of the Defendant were introduced, and commenced negotiations regarding the purchase of the Loan Documents. (Complaint, ¶¶ 13,18). Contemporaneous with the purchase of the Loan Documents, TY Grand and 4100 West Grand entered into a negotiated

Loan Modification Agreement ("Forbearance Agreement") wherein the Defendant agreed to forbear pursuing its remedies in connection with existing defaults on the Loan Documents. (Plaintiff's Exhibit, 11). Execution of the Forbearance Agreement was contingent upon the consummation of the note purchase by the Defendant.

Pursuant to its terms, the Defendant agreed to reduce the $2.1 million original loan balance to $865,000[2] ("Reduced Balance") if the Plaintiff made certain payments and otherwise complied with the terms set forth in the Forbearance Agreement. (Joint Stipulation, ¶ 10, Forbearance Agreement, 1.1(d)).

The salient terms of the Forbearance Agreement are as follows:

### Article I, Section 1.1

(a) The maturity date of the Loan shall be June 29, 2011.
(b) Immediately upon the full execution of this Agreement, Borrower [Plaintiff-Debtor] shall make a payment of . . . $110,000 to Lender.
(c) Commencing on April 15, 2011. . . Borrower shall make monthly payments to Lender in the amount of $15,000.00. Theses [sic] monthly payments shall not be applicable to the Reduced Payoff Amount (as hereinafter defined).
(d) In full satisfaction of the Loan Documents and this Agreement, Borrower shall (prior to the Maturity Date) make a payment in the amount of $710,000 (the "Reduced Payoff Amount") to Lender. Upon delivery of such payment (provided no default per this Agreement has occurred), Borrower and Guarantor shall be released from further obligations under the Loan Documents and this Agreement.
Forbearance Agreement, 1.1.

**Section 1.2 Representations and Warranties.** To induce Lender to execute and perform this Agreement and as contemporaneous consideration

---

[2]The $865,000 figure is calculated by adding the down payment of $110,000, the three monthly payments of $15,000 each (which total $45,000), for a total of $155,000; that $155,000 when subtracted from $865,000 equals the final "reduced payoff amount" of $710,000.

for Lender's forbearance detailed in Section 1.1 hereof, Borrower and Guarantor hereby represent, covenant and warrant to Lender as follows:

(a) As of January 20, 2011, the total amount outstanding on the Loan is . . . ($2,510,123.90).

(d) All utility bills applicable to the Property are paid current.

(i) The Mortgage is a first priority mortgage lien on the Property and all real estate taxes (which are due and payable) applicable to the Property have been paid in full.

(k) There exist no exceptions to title except those set forth in Exhibit C attached hereto and incorporated herein by reference (the "Permitted Exceptions").

(l) The terms, provisions, representations and warranties of the Loan Documents (which are not specifically modified herein) shall remain in full force and effect. Furthermore, the agreement by Lender to forbear certain defaults shall not be a waiver of the right to pursue such defaults in the future, nor shall be a waiver of Borrower's duty to strictly comply with the terms of the Loan Documents.

**2.2**   **Recordation of Deeds Upon Lender's Discretion.** Upon a default by Borrower and/or Guarantor, pursuant to the terms of the Loan Documents (as revised by this Agreement) or this Agreement, Lender shall have the right (but not the obligation unless otherwise set forth herein) to record the Return Deed (as a deed in lieu of foreclosure) and cause the Property to be transferred to Lender.

**2.4.**   **Mandatory Recordation of Deed.** Notwithstanding anything contained herein, provided Borrower does not default in the future pursuant to the terms of this Agreement or the Loan Documents, other than the failure to the [sic] monthly payments detained in 1.1(c) or the payment of the Reduced Payoff Amount, Lender shall cause the Return Deed to be recorded (as a deed

in lieu of foreclosure) pursuant to the terms of this Agreement . . . .

**2.5    Release of Deficiency**

(a) Lender, in connection with a breach by Borrower and /or Guarantor of the terms of this Agreement relating solely to the payments of money pursuant to section 1.1(c) hereof or the payment of the Reduced Payoff Amount, *hereby waives, releases, relinquishes and surrenders the right to bring any judicial action (including a lawsuit) that Lender may have for monetary damages against Borrower and /or Guarantor as a result of this Agreement and the Loan Documents, whether capable of being exercised now or in the future, including, but not limited to, any known or unknown actions.* That said, upon such recordation of the Return Deed, coupled with the covenant not to sue detailed in the preceding sentence, Lender reserves the right to pursue any action (not involving Borrower or Guarantor) relative to the Property, including an action to foreclose the Mortgage. (emphasis added).

(b) Should Borrower or Guarantor breach the terms of this Agreement relating to any representations or clauses contained herein (other than solely failing to make the payments detailed in Section 1.1(c) or the payment of the Reduced Payoff Amount), Lender shall have available any and all remedies against Borrower and Guarantor (including the right to pursue the full deficiency). In connection with a default detailed pursuant to this Section 2.5(b), Lender shall have the right to record the Return Deed and immediately pursue a deficiency (based on the Property being valued at the Reduced Payoff Amount).

*See* Plaintiff's Ex. 11.

As described above, the $710,000 "reduced payoff amount" was not a permanent reduction of the principal loan balance. Rather, the parties agreed that if this amount was paid by a certain date, it would be accepted in full satisfaction of

the loan balance, provided that $15,000 monthly payments were made. (Trial Tr. at 93, 95). Debtor did not make the final payment of $710,000.

The Debtor's failure to remit the final lump sum payment led to the execution of an Amendment to the Forbearance Agreement on or about June 29, 2011, which extended the maturity date through September 29, 2011 and allowed the Plaintiff more time to perform under the agreement and still take advantage of a Reduced Payoff Amount. (See Plaintiff's Ex. 12, Amendment to Forbearance Agreement; Joint Stipulation, ¶ 11). In order to receive the new reduced payoff amount of $460,000, the Amendment to the Forbearance Agreement required the Debtor to pay three extension payments in the amount $100,000 each, and a $50,000 non-refundable extension payment. *See* Paragraph 2, pg. 2 of Amended Forbearance Agreement. In sum, 4100 West Grand paid $300,000 to obtain a credit in the amount of $250,000 which lowered the reduced payoff amount from $710,000 to $460,000. (Trial Tr. at 96). Each extension payment was made. *See* Defendant's Answers to Requests to Admit; Plaintiff's Trial Ex. 19, p. 10.

The Amendment to the Forbearance Agreement reduced the monthly payments from $15,000 to $10,000 and provided for a balloon payment of $460,000 to be made on or before September 29, 2011. Exclusive of payment defaults, or misrepresentations under the warranties provision, the reduced payoff amount of $460,000 would have been accepted in full satisfaction of the loan balance, which as of the Transfer date, was approximately $2,278,118. *See also* Plaintiff's Ex. 18, June 29, 2011 Payoff Letter; Plaintiff's Ex. 12, Amendment to Forbearance Agreement.

On September 29, 2011, the Plaintiff failed to pay the reduced payoff amount. On September 30, 2011, as required by the provisions of the Forbearance Agreement, as amended, the Defendant recorded the Deed in Lieu of Foreclosure

-7-

and took title and possession of the Property (the "Transfer").

A review of the payment history, reproduced below, reveals that between March 23, 2011 and September 29, 2011, the Plaintiff paid the Defendant $485,000 under the terms of the Forbearance Agreement and the Amendment to the Forbearance Agreement. (Joint Stipulation, ¶ 11).

| | | |
|---|---|---|
| Earnest Money | $10,000.00 | 3/29/2011 |
| Forbearance Down Payment | $100,000.00 | 3/29/2011 |
| April Payment | $15,000.00 | 4/15/2011 |
| May Payment | $15.000.00 | 5/15/2011 |
| June Payment | $15,000.00 | 6/15/2011 |
| 1st Extension | $100,000.00 | 7/1/2011 |
| 2nd Extension | $100,000.00 | 7/15/2011 |
| July Payment | $10,000.00 | 7/15/2011 |
| 3rd Extension | $100,000.00 | 7/22/2011 |
| August Payment | $10,000.00 | 8/15/2011 |
| September Payment | $10,000.00 | 9/15/2011 |
| **Total Payments:** | **$485,000.00** | |

*See* Defendant's Answers to Requests to Admit; Plaintiff's Trial Ex. 19, p. 10.

### D.   The Bankruptcy and Adversary Proceedings

Five days after the deed was recorded, on October 22, 2011, Plaintiff filed a petition for relief pursuant to Chapter 11 of the Bankruptcy Code ("Code"). Bankruptcy Case No. 11-428732, dkt. no. 1. On October 27, 2011, Plaintiff filed the instant adversary proceeding to avoid and recover an alleged fraudulent transfer

-8-

pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B) of the Bankruptcy Code and 740
ILCS §§ 160/5 and 160/6. Adversary Case No. 11-02278, dkt. no. 1. Under Section
548(a)(1)(B) of the Code, a trustee can avoid a transfer made for less than
reasonably equivalent value if the debtor was insolvent at the time of the transfer
or became insolvent as the result of the transfer. This is the Code's constructive
fraudulent transfer provision.

Sometime after the instant adversary proceeding was filed, the Defendant
learned that the Plaintiff breached certain warranties and representations made in
the Forbearance Agreement, as amended. In particular, the Defendant discovered
that at the time the parties entered into the Forbearance Agreement, the City of
Chicago had issued several building code citations relating to the Property and that
the Debtor had not paid real estate taxes due and owing for the years 2008, 2009
and 2010. *See* Plaintiff's Response to Request for Admissions, TY Grand Ex. 15, ¶ ¶
25-33. (Joint Stipulation, ¶¶ 15-16, dkt. no. 73).

The Defendant claims that on the September 30, 2011 Transfer date, it had
no knowledge of any defaults by the Plaintiff other than the payment default.
Therefore, after the Return Deed was recorded, it did not intend to pursue its
remedies under section 2.5(b) of the Forbearance Agreement which allowed TY
Grand to sue for misrepresentations regarding the real estate taxes and the City of
Chicago code citations. (Trial Tr. at 208, 217, 231 and 315).

During Defendant's due diligence investigation prior to purchasing the Loan
Documents, Mr. Brotschul ordered a Title Commitment from the Chicago Title
Insurance Company. (Plaintiff's Ex. 10, Trial Tr. at 82-83). That search, however,
did not reflect the status of the real estate taxes because the closing was scheduled
to occur within a short time frame. (Trial Tr. at 82-83). The Defendant relied on
the representations made in section 1.2 of the Forbearance Agreement, and of the

Guarantors that the taxes were paid. (Trial Tr. at 82-83, 172, 208). In its discovery responses, the Plaintiff admitted that as of the date of signing the Forbearance Agreement, it was not current on all real estate taxes due and owing, and that as of the date of signing the Forbearance Agreement, it knew that the City of Chicago had issued building code citations relative to the Property. *(See* Defendant's Ex. 15, Plaintiff's Response to Request for Admissions).

A breach of contract claim is currently pending in the Circuit Court of Cook County against the Guarantors based on the alleged misrepresentations made in Section 1.2 of the Forbearance Agreement. It was filed after TY Grand was sued herein. (Trial Tr. at 229).

## 1. Defendant's Proofs of Claim

A review of the claims registry in the bankruptcy case reveals that the Defendant filed four varied proofs of claims pertaining to the alleged breaches under the Amended Forbearance Agreement.

On January 31, 2012, the Defendant filed proof of claim no. 3-1 in the amount of $2,125,655.74 which represented principal, interest and other charges due under the applicable loan documents. The claim also noted that TY Grand's claim was secured by the Property if the Debtor prevailed in the litigation but if TY Grand prevailed in the litigation, its claim would be unsecured. Bankruptcy Case No. 11-42873, Claim 3-1.

On February 1, 2012, the Defendant filed proof of claim no. 3-2 in the amount of $2,125,655.74. A comparison of proofs of claim nos. 3-1 and 3-2 reveals no substantive variation.

-10-

On May 24, 2012, the Defendant filed proof of claim no. 3-3 in the amount of $2,262,170.34. Bankruptcy Case No. 11-42873, Claim 3-3. In its exhibit to the claim, Defendant noted that depending on the outcome of the litigation, there were two different amounts of its claim. If TY Grand prevailed in the litigation, its claim would be $2,262,170.34 and if TY Grand did not prevail in the litigation, its claim would be $2,722,170.34. The testimony at trial revealed that claim no. 3-3 was filed to correct the contractual set-off amount for the Property. (Trial Tr. at 278).

On July 2, 2012, the Defendant filed proof of claim no. 3-4. As amended, the claim states that if the Plaintiff prevailed in the litigation, TY Grand's secured claim would be $2,722,170.34. If TY Grand prevailed in the litigation, TY Grand would have no claim against the Debtor. Bankruptcy Case No. 11-42873, Claim No. 3-4.

Proof of claim no. 3-5 was also filed on July 2, 2012, and provides that if TY Grand did not prevail in the litigation, its secured claim would be $2,722,170.34. If TY Grand prevailed in the litigation, it would have no claim against the Debtor.

Plaintiff has not filed an objection to any of the Defendant's proofs of claim.

No claims bar date has been set in Debtor's bankruptcy case.

## III.   DISCUSSION

### A. Count I - Alleged Constructive Fraudulent Transfer Pursuant to Section 548(a)(1)(B)

Count I of the Complaint asserts a claim for avoidance and recovery of an alleged fraudulent transfer pursuant to Section 548(a)(1)(B) of the Bankruptcy Code. That section provides as follows:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

   (B)  (i) received less than reasonably equivalent value in exchange for such transfer or obligation; and

         (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

              (II) was engaged in business or a transaction, or was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital;

              (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debtors matured; or

              (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Thus, to establish a constructive fraudulent transfer claim, the trustee must prove the following elements: (1) a transfer of the debtor's property (2) made within two years of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) the

debtor was insolvent at the time of the transfer. *General Search.com v. Reliant Interactive Media Corp. (In re General Search.com)*, 322 B.R. 836, 842 (Bankr. N.D. Ill. 2005); 11 U.S.C.§ 548(a)(1)(B).

The Plaintiff has standing to bring this adversary proceeding pursuant to section 1107(a), which vests in a debtor-in-possession the same rights, powers and duties of a trustee serving in a case under this chapter. 11 U.S.C. § 1107(a).

### 1.      Transfer of an Interest of the Debtor In Property

The Parties have stipulated and the Court finds that the September 30, 2011 recording of the Return Deed was a transfer pursuant to section 548(a)(1). *See* Adv. No. 11-02278, Addendum to Second Amended Joint List of Stipulated Facts, dkt. no. 90, ¶ 40. The Court also finds that the September 30, 2011 Transfer occurred within two years of the October 22, 2011 Petition Date. *See* dkt. no. 73, ¶ 39.

### 2.      The Debtor was Insolvent

The Parties' joint stipulation of facts states that on the date of the Transfer, the Debtor was insolvent. *See* Adv. No. 11-02278, Addendum to Second Amended Joint List of Stipulated Facts, dkt. no. 90. *See also* Plaintiff's Proposed Findings of Fact and Conclusions of Law, dkt. no. 63, ¶ 40. Accordingly, the Court finds that on the date of the Transfer, the Debtor was insolvent or became insolvent as a result of the Transfer.

Thus, the only issue for determination is whether the Defendant received reasonably equivalent value in exchange for the September 30, 2011 Transfer.

3.    **Reasonably Equivalent Value**

Determination of reasonably equivalent value is a two-step inquiry. *General Search.com*, 322 B.R. at 844. First, the court must "determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up." *Id.* at 844. *See also Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997) ("The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and compare it to what was received."). "Whether value has been given for a transfer depends on all of the circumstances surrounding the transaction." *Scherer v. Quality Commc'ns, Inc. (In re Quality Commc'ns Inc.)*, 347 B.R. 227, 234 (Bankr.W.D.Ky. 2006).

The Seventh Circuit has held that there is no fixed mathematical formula for determining reasonably equivalent value[3]. *Barber*, 129 F.3d at 387; *Bundles v. Baker (In re Bundles)*, 856 F.2d 815, 824 (7th Cir. 1988). Rather, the determination of reasonably equivalent value depends on the facts of each case. *Id. at 387.* The

---

[3]In discussing reasonably equivalent value in the foreclosure context, the Supreme Court has opined:

> Our discussion assumes that the phrase "reasonably equivalent" means "approximately equivalent," or "roughly equivalent." One could, we suppose, torture it into meaning "as close to equivalent as can reasonably be expected" - in which event a vast divergence from equivalent value would be permissible so long as there is good reason for it. On such an analysis, fair market value *could* be the criterion of equivalence, even in a forced-sale context; the forced sale would be the reason why gross inequivalence is nonetheless reasonable equivalence. Such wordgaming would deprive the criterion of all meaning. If "reasonably equivalent value" means only "as close to equivalent value as is reasonable," the statute might as well have said "reasonably infinite value."

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 n.4 (1994)

-14-

court should consider such factors as: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Apex Automotive Warehouse, L.P. v. Carmell (In re Apex Automotive Warehouse)*, 238 B.R. 758, 773 (Bankr. N.D.Ill. 1999). The burden of proving lack of reasonably equivalent value under section 548 rests on the Trustee. *General Electric Credit Corp. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 726 (11th Cir. 1990).

a.    **Did the Debtor receive value in exchange for the September 30, 2011 Transfer ?**

First, the Court must determine whether the Debtor received value in exchange for the recordation of the Return Deed. For section 548 purposes, value is defined as "property, or satisfaction of a present or antecedent debt of the debtor . . . ." *See* 11 U.S. C. § 548(d)(2)(A). The Court finds the bankruptcy court decision in *In re Stipetich* to be instructive on this issue. *Stipetich v. First Mount Vernon Industrial Loan Association (In re Stipetich)*, 294 B.R. 635 (Bankr. W.D. Pa. 2003).

In *Stipetich*, a chapter 11 debtor filed an adversary proceeding to set aside a transfer pursuant to Bankruptcy Code section 548(a)(1)(B). The debtor alleged that the recording of a deed, which operated to convey title, was constructively fraudulent under section 548 and Maryland's fraudulent conveyance statute. In support of her position, the debtor argued that the subject property was worth $1.1 million on the date of the transfer, and that the value she received in return for the deed "was not worth anywhere near $1.1 million." The deed was accepted by the lender in full satisfaction of debtor's obligation on the loan. *Id* at 648-49. In ruling on the parties' cross motions for summary judgment, the court held that the debtor

-15-

received value, equal to the amount of debtor's outstanding indebtedness on the loan as of the transfer date. For purposes of deciding reasonably equivalent value, the court determined the value to be measured against the value of the real property conveyed to be $740,000, which represented the amount contractually due and owing on the debtor's loan. *Id.* at 649. *BFP v. Resolution Trust Corp.*, 511 U.S. at 535 ("[V]alue means, for purposes of § 548, property, or satisfaction or securing of a . . . debt of the debtor."); *Lakeside Community Hospital, Inc. v. Orr (In re Lakeside Community Hospital)*, 200 B.R. 853, 857 (Bankr. N.D. Ill. 1996) *(*"Satisfaction of a debt of the debtor is defined as value in Section 548(d)(2)(A)").

Similarly herein, the Court finds that the release of Plaintiff's indebtedness of over $2 million under the Loan Documents is value for purposes of section 548. On the Transfer Date, the balance due under the Loan Documents was approximately $2,278,118. *See* Plaintiff's Ex. 17, Affidavit of Ruben Ybarra; Defendant's Proposed Findings of Fact and Conclusions of Law, dkt. no. 66, ¶ 14. The unrebutted testimony of Mr. Ybarra and Mr. Brotschul, Defendant's Managers, reveals that on September 30, 2011, the Defendant was not aware of the misrepresentation defaults, and did not intend to pursue any claims it may have had against the Plaintiff under the Forbearance Agreement, as amended, and under the underlying Loan Documents. Accordingly, pursuant to section 2.5(a), the provision governing payment defaults, the Court determines the value conveyed to the Plaintiff by virtue of the release of its indebtedness, to be approximately $2,278,118. The Plaintiff also received value from the Transfer when, according to the Forbearance Agreement, the Defendant waived its right to pursue monetary damages for any deficiency owed. *See Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01-6209, 2002 WL 31412465, at *5- 6 (S.D.N.Y. Oct. 24, 2002) (recognizing that a lender's waiver of its right to pursue default remedies is value for purposes of determining reasonably equivalent value).

-16-

### b.    Did the Debtor Receive Reasonably Equivalent Value in Exchange for the September 30, 2011 Transfer?

Having determined that the Debtor received value, next the Court must evaluate whether the value conveyed to the Debtor by virtue of the release of $2.5 million indebtedness and the waiver were reasonably equivalent to the value the Defendant received. The Parties stipulated that the real estate was worth $1,115,000 on the Transfer date. (Joint Stipulation, ¶ 23 dkt. no. 73). The Court must also consider the $485,000 cash the Defendant received over the course of the forbearance transaction.

The Plaintiff argues that it did not receive reasonably equivalent value in exchange for the Transfer because pursuant to section 2.5(b) of the Forbearance Agreement, the Debtor received only a $460,000 contractual set off amount in exchange for the Property worth $1,115,000.[4] (Trial Tr. at 221-22). In further support, the Plaintiff relies on the Defendant's prior amended proofs of claim nos. 3-2 and 3-3 as an admission that only a value of $460,000 was given as a credit for the Property. *See* Plaintiff's Trial Brief, Adv. No. 11-02278, dkt. no. 63, at 8. Federal Rule of Bankruptcy Procedure 3003(c)(4) provides that "A proof of claim or interest executed and filed in accordance with this subdivision shall supersede any scheduling of that claim or interest pursuant to § 521(a)(1) of the Code." The admissions/proofs of claim relied upon by the Plaintiff have been superseded by the Defendant's later filed proof of claim.

In any event, the Plaintiff's reliance on the $460,000 amount is misplaced. The uncontested evidence at trial reveals that on September 30, 2011, section 2.5(b)

---

[4]Although the contractual set-off amount listed in section 2.5(b) of the Forbearance Agreement is $500,000, the testimony of the parties at trial reveals that the amount was subsequently lowered to $460,000. *See* Trial Tr. at 119-20, 280.

was not in effect as the alleged misrepresentation breaches under the Forbearance Agreement were not known by the Defendant at that time. (Trial Tr. at 161). The Debtor's failure to make the final payment in the amount of $460,000 led to the recordation of the Return Deed that is the subject of this litigation. Indeed, Mr. Ybarra, Defendant's manager, testified that at the time of the recording on September 30th, "since [the failure to make the final payment] was the only thing at the time we knew of that they violated, we deemed the transaction to be over" and that "the guarantors were released of their obligation, so we deemed it to be done." (Trial Tr. at 263). Accordingly, for purposes of calculating the value the Debtor received, the Court will focus its inquiry on Section 2.5(a), which the Court deems governed the Transfer.

The Defendant argues that the Forbearance Agreement mandates that the Return Deed be recorded as a deed in lieu of foreclosure in the event of a payment default[5]. *See* Forbearance Agreement, Section. 2.4. Thus, following the Plaintiff's payment default, the Defendant recorded the Return Deed.

Section 2.5(a) of the Forbearance Agreement provides that the Defendant waives the right to go after the Plaintiff for any deficiency due under the agreement. In other words, on September 30, 2011, TY Grand waived and released any action it may have had for monetary damages under the Agreement and the Loan Documents.

---

[5]Section 2.4 of the Forbearance Agreement may not clearly reflect the Defendant's position that the provision mandated the recording of the deed. However, section 2.2, Recordation of Deeds Upon Lender's Discretion, provides that "Upon a default by Borrower and/or Guarantor, pursuant to the terms of the Loan Documents (as revised by this Agreement) or this Agreement, Lender shall have the right (but not the obligation unless otherwise set forth herein) to record the Return Deed (as a deed in lieu of foreclosure) and cause the Property to be transferred to Lender."

The Plaintiff devoted much time in its pleadings and at trial on the contention that on September 30, 2011, the Defendant had the right to go after the Plaintiff for the total balance due on the Loan because of the additional defaults under the loan documents, namely, the failure to disclose the unpaid real estate taxes, and the City of Chicago violations. However, in considering reasonably equivalent value, the Court must focus its inquiry on what was known by the parties at the time of the transfer. [6] *Morris Commc'ns NC, Inc. v. Ashley Commc'ns, Inc. (In re Morris Commc'ns )*, 914 F.2d 458, 466 (4th Cir. 1990) (noting that the critical time in determining whether reasonable equivalent value was given is when the transfer is made); *See also Fairchild Aircraft Corp. v. Whyte (In re Fairchild Aircraft)*, 6 F.3d 1119, 1126 (5th Cir. 1993); *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 589 (Bankr. N.D.Ill. 2005) ("Equivalent value must be measured as of the time of the transfer."). Defendant's representatives testified at length that on September 30, 2011, they had no knowledge of the additional defaults and therefore the Defendant did not intend to pursue the Plaintiff further. This point was not refuted at trial by the Plaintiff.

The evidence also reveals that the Debtor did not list any co-debtors on Schedule H of its Petition. This omission lends further support to the Court's conclusion that both parties believed that the guarantors were released as provided for in the Forbearance Agreement. *See In re Morris Commc'ns* , 914 F.2d at 466. (Trial Tr. at 332). Otherwise, the guarantors could have been scheduled as co-debtors or co-obligors.

The Plaintiff next proffers that the Defendant purchased the Loan

---

[6]Baird & Jackson, Fraudulent Conveyance Law & Its Proper Domain, 38 VNLR 829, 842 (May, 1985) (opining that consideration should be valued at the time of the transfer based on then-present knowledge).

Documents for $515,000, received $485,000 over the six-month course of the forbearance transaction, and has been collecting $20,000 in rent from the Property, thereby concluding that the transaction lacked reasonably equivalent value because the note cost the Defendants only $30,000. The plaintiff cannot complain that the transfer between the Royal Bank of Scotland and the Defendant was avoidable as a fraudulent conveyance because the Property transferred therein was not the Plaintiff's. That transaction has no relevance to the September 30, 2011 transfer in issue herein. The Plaintiff again ignores the realities of its bargain with the Defendant, the language of the forbearance documents and the economic realities of the transaction. By virtue of the forgiveness of debt, the Defendant gave up the right to go after the Plaintiff for the unpaid loan balance, which as explained above exceeded $2 million and constitutes value for section 548 purposes. Justice Scalia's comment in *BFP* that fair market value would not be the only criterion of equivalence is relevant herein. There, he noted that gross inequivalence was nonetheless reasonable equivalence. While the Defendant herein paid only $515,000 for an opportunity to obtain real estate of greater value, here too, the Court finds that a limited comparison of the dollar amounts that changed hands does not reflect the totality of the economic realities of the September 30, 2011 transfer.

Defendant TY Grand received $485,000 before September 29, 2011, and property worth $1,115,000 on September 30, 2011. Comparing these amounts, TY Grand received $1,600,000 (which amount represents the $1,115,000 value of real estate plus $485,000 in payments made) whereas the Plaintiff received a release of a $2.5 million debt. Fraudulent transfer liability is triggered when a plaintiff receives less than what was transferred to a defendant, which is not the case here. The Plaintiff received more than what was transferred to the Defendant.

The Court also rejects the Plaintiff's contention that the transaction lacked

reasonably equivalent value because the parties' agreement was not an arms length deal, but rather a distress situation. The evidence adduced at trial suggests otherwise. Both Mr. Brotschul and Mr. Ybarra testified that prior to the execution of the Forbearance Agreement, there were several meetings, telephone calls, and email exchanges during which the terms of the proposed agreement were discussed and modified at the request of the parties. (Trial Tr. at 139-40). Indeed, handwritten changes were made to section 2.5(a) of the Forbearance Agreement, initialed by both Mr. Brotschul and Mr. Sullivan, who represented the Plaintiff during negotiations.[7] *See* Defendant's Exhibit 10, p. 5; (Trial Tr. at 144-45, 155-56).

Moreover, the Court does not believe Mr. Sopcic's testimony that neither he, nor the other principals of the Debtor read the Forbearance Agreement, especially since they had three months to read the initial agreement entered into in March, 2011 before they executed the Amendment to the Forbearance Agreement on June 29, 2011. Given Mr. Sopcic's testimony as to his vast experience in real estate matters, the Court finds it unlikely that he would enter into such an agreement without reading it. (Trial Tr. at 305, 316, 340). In any event, Mr. Sopcic was represented by counsel during the negotiation and execution of the agreements. (Trial Tr. at 303-07). Plaintiff's suggestion that this was a distressed transaction is not supported by the facts.

Finally, the Debtor points to the Defendant's knowledge of the Debtor's default under the Loan Documents as indicia of bad faith. The fact that the Defendant was aware of the Plaintiff's default under the Loan Agreements is not sufficient to support a finding that the Defendant did not act in good faith, especially in light of the circumstances leading up to the execution of the

---

[7]The testimony at trial reveals that Attorney Michelle Aljinovic represented the Plaintiff during the negotiation of the Amendment to the Forbearance Agreement. (Trial Tr. at 156).

Forbearance Agreement and the amendment thereto. According to the testimony at trial, the transaction could have resulted in an equity cushion for the Plaintiff. (Trial Tr. 255). The Defendant maintains that the Plaintiff had been underwater by approximately $1.4 million in that the Plaintiff's debt was $2,500,000 with a property valued at $1,115,000. (Trial Tr. at 254-255). The Defendant's manager, Mr. Ybarra, testified that had the Plaintiff taken advantage of the reduced payoff amount of $710,000, the Plaintiff would have ended up with $300,000 in equity. (Trial Tr. at 254-255).

The evidence also reveals that around the time the June balloon payment of $710,000 became due, the Defendant agreed to amend the terms of the Forbearance Agreement to allow the Plaintiffs more time to take advantage of a Reduced Payoff Amount and receive a release of the principal balance. No request was made by the Plaintiff for a further extension when it became apparent that the September 29, 2011 payment would not be made. (Trial Tr. at 261-262).

The Court finds that Plaintiff has not proved, by a preponderance of the evidence, that it received less than reasonably equivalent value in exchange for the Transfer. The Court also finds that the release of the Plaintiff's indebtedness of over $2,000,000 (and the waiver of the other claims) was reasonably equivalent to the $1.6 million the Defendant received. The amount of Plaintiff's debt satisfaction alone, not counting the waiver of claims, is reasonably similar to the value transferred to the Defendant. *See In re Dullea Land Co. v. Ideal AG Corp. (In re Dullea Land Co.)* Case No. 00-31676, 2001 WL 1892189, at * 7 (Bankr.D.N.D. June 21, 2001) ("[If] the amount of debt satisfaction was reasonably similar to the fair market value of the property transferred to the creditor, no fraudulent transfer has occurred"), *aff'd*, 269 B.R. 33 (B.A.P. 8th Cir. 2001). Accordingly, the Court finds for the Defendant as to Count I of the Complaint.

### B. Count II - Avoidance of Fraudulent Transfers pursuant to 740 ILCS §§ 160/5 and 160/6.

In Count II of the Complaint, the Plaintiff asserts a claim for the avoidance and recovery of transfers pursuant to Illinois law. *See* 740 ILCS §§ 160/5 and 160/6 and 11 U.S.C. § 544(b) which allow a trustee to avoid transfers under applicable state law. The requirements of 11 U.S.C. 548 and sections 5 and 6 of the Illinois Uniform Fraudulent Transfer Act are analogous. *Solow v. Reinhardt (In re First Commercial Mgmt. Group, Inc.)*, 279 B.R. 230, 240 (Bankr. N.D. Ill. 2002) ("Except for different statutes of limitations, the state and federal statutes are functional equivalents, and the analysis applicable to the first count is also applicable to the second."). Accordingly, for the reasons noted herein as to Count I, the Court finds for the Defendant on Count II of the Complaint as the Plaintiff has not sustained its burden of proof on the issue of reasonably equivalent value.

### C. Count III - Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §550.

Because the Court finds for the Defendant on Counts I and II of the Complaint disallowing the Plaintiff's avoidance claim, the Court need not address the merits of Plaintiff's Section 550 claim in Count III, which allows a trustee to recover avoided fraudulent transfers.

## III.   CONCLUSION

For the foregoing reasons, the Court finds for the Defendant on Counts I, II and III of the Complaint. The Plaintiff has not sustained its burden of proving that the Plaintiff did not receive reasonably equivalent value in exchange for the September 30, 2011 Transfer.

-23-

This memorandum opinion constitutes the Court's Findings of Fact and
Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052. A
separate judgment order will issue.

**DATED: October 4, 2012**                ENTER:    *Jacqueline P. Cox*

                                          _J.P.Cox_____

                                          **Jacqueline P. Cox**
                                          **U.S. Bankruptcy Judge**